JUL 6 2026 PM3:08
FILED - USDC - FLMD - TPA

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

RANDY AYRES,
    Plaintiff,

v.

DEPUTY MICHAEL FAUL, individually;
DEPUTY WILLIAM MORGAN, individually;
SERGEANT DUSTIN WIATRAK, individually;
SHERIFF ROBERT GUALTIERI, in his official capacity;
    Defendants.

Case No.: 8:26-cv-**01929-KKM-LSG**

## COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF
### (Jury Trial Demanded)

### INTRODUCTION

1.     This case asks whether a law-enforcement officer may constitutionally surveil and intercept a person documented as the anticipated resolution to a non-emergency call, block that person from resolving the matter, solicit a trespass as that person is departing, and then access that person's protected motor-vehicle records and insert a state driver's license photograph into an official police report while falsely representing its provenance.

2.     The answers are found not in credibility disputes, but in government records. Police Report SO22-211133 asserts the result of a database query that errored and returned no data, contains a motor-vehicle photograph from a database that was never accessed, and describes events that body-worn camera footage affirmatively proves did not occur.

**Government Records vs. Police Report SO22-211133**

3.     Police Report SO22-211133 states that "one (1) photo was taken of Randy and uploaded." No photograph of Plaintiff was ever taken. Defendant Faul's body-worn camera documents the entire encounter and shows none. Instead, the report contains Plaintiff's Michigan Department of State driver photograph, despite Defendants never possessing Plaintiff's license and never completing a valid database query capable of producing such an image. The FDLE Transaction Archive Report documents that Defendant Faul's only person query on Plaintiff errored and returned no data. The Michigan Secretary of State's record-access disclosure shows zero access to Plaintiff's Michigan driving record by any Florida entity during all of 2022, and zero access by any entity between July 7, 2022 and the date Police Report SO22-211133 was generated.

4.     The non-emergency call was not about Plaintiff. It was about Plaintiff's companion. The CAD record documented Plaintiff as the anticipated resolution: "SUBJ MADE RESERVATION UNDER BOYFRIENDS NAME WHO IS SUPPOSED TO COME TO LOC LATER." No one asked Plaintiff to leave. No one requested that Plaintiff be trespassed. Rather than wait for the documented solution, Defendant Faul intercepted Plaintiff in the parking lot when he arrived from his medical clinic. Defendant Faul was positioned in the porte cochère. He had no line of sight to where Plaintiff parked and no description of Plaintiff or his vehicle. He had monitored Plaintiff's



phone call from inside Room 208. He had muted his body-worn camera in his vehicle at 15:28:55 — shortly before Plaintiff appeared at 15:33:11. He obstructed Plaintiff from the front desk. He watched Plaintiff tender his credit card and the hotel decline to take it, and proceeded anyway. He solicited a trespass from a non-management employee as Plaintiff was departing, even though no one from the hotel had asked Plaintiff to leave or asked Defendant Faul to remove him. He queried Plaintiff's motor-vehicle records from a plate check along with Defendant Morgan, though Plaintiff was not a suspect, was not the subject of the call, was not present when the deputies were summoned, and had left without incident to return to his clinic. And he ran a further person-check query after the incident was cleared as non-criminal and Plaintiff had left the property and returned to his clinic. He then generated official records containing Plaintiff's personal information. All body-worn camera timestamps in this Complaint refer to Defendant Faul's body-worn camera recording and are approximate, provided to map facts and quotations to that recording for rapid location and review. Each timestamp marks the approximate initiation point of the referenced quote or event, not its full span. Minor variance in any single timestamp reflects playback, transcription, and frame-pause artifacts and is not a material factual allegation. The sequence of events and the intervals between them are alleged as fact and are apparent on the face of the recording. Defendant Morgan, though visibly wearing a body-worn camera, produced no footage.

## JURISDICTION AND VENUE

5.      This Court has federal question jurisdiction under 28 U.S.C. § 1331. Plaintiff's claims arise under 42 U.S.C. § 1983 (Fourth and Fourteenth Amendment violations) and the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721–2725. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's Florida state law claim under Fla. Stat. § 934.10, which arises from the same case or controversy as Plaintiff's federal claims.

6.      Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in Pinellas County, Florida.

## PARTIES

7.      Plaintiff Randy Ayres is a licensed physician holding medical licenses in Michigan and Florida. On July 7, 2022, Randy Ayres was providing medical care at a clinic in the Tampa Bay area during the COVID-19 public health emergency when he was called away to respond to police involvement at his hotel room.

8.      Defendant Deputy Michael Faul (Badge #60536) is a deputy sheriff employed by the Pinellas County Sheriff's Office. At all relevant times, Defendant Faul was acting under color of state law. He is sued in his individual capacity.

9.      Defendant Deputy William Morgan (Badge #59799) is a deputy sheriff employed by the Pinellas County Sheriff's Office. At all relevant times, Defendant Morgan was acting under color of state law. He is sued in his individual capacity.

10.      Defendant Dustin Wiatrak — a Corporal at the time of the events and now a Sergeant — is employed by the Pinellas County Sheriff's Office and approved Police Report SO22-211133 on July 11, 2022. He is sued in his individual capacity.

11.      Defendant Sheriff Robert Gualtieri is the Sheriff of Pinellas County, Florida, and is responsible for the policies, practices, and customs of the Pinellas County Sheriff's Office. He is

sued in his official capacity as the final policymaker for the Pinellas County Sheriff's Office and as the entity defendant for purposes of Monell liability under 42 U.S.C. § 1983.

## FACTUAL ALLEGATIONS

### A. Background

12.     Plaintiff is a Priceline VIP Platinum member who regularly stays at Holiday Inn properties during his medical practice rotations between Michigan and Florida. On May 20, 2022, Plaintiff stayed at the Holiday Inn Express at 4816 100th Way N, Seminole, Florida — the same property at issue in this case — without incident. On June 30 through July 5, 2022, Plaintiff stayed at the Holiday Inn Detroit Northwest in Livonia, Michigan, for five consecutive nights across two reservations (including an extension) without incident. All reservations were booked through Priceline, paid in full, and completed without complaint or police involvement.

13.     On July 5, 2022, Plaintiff checked into the Holiday Inn Express at 4816 100th Way N, Seminole, Florida, Room 208. He provided his credit card for incidentals at check-in. The hotel swiped and processed this card.

14.     On the morning of July 7, 2022, at 08:11 a.m., Plaintiff extended the reservation through July 9, 2022, via Priceline. He paid for this extension in full, precisely as he had done on Saturday, July 2, 2022 at the Holiday Inn Detroit Northwest in Livonia, Michigan.

15.     He then departed for his medical clinic to provide patient care during the COVID-19 public health emergency.

### B. Hotel Conduct Preceding Plaintiff's Return

16.     Instead of waiting for Plaintiff to return with the card — as the staff three days earlier had done at the Holiday Inn in Livonia, Michigan — hotel manager Widad (Lizzie) Maclah called Plaintiff's companion, Shelley Gillay, at least five times over several hours before check-in on the extended reservation, demanding a card Ms. Gillay did not possess and could not produce. Plaintiff had his card and was at work.

17.     Maclah then came to Room 208 on at least two occasions for the same card, with multiple staff including her general manager, despite a displayed "Do Not Disturb" sign, all before check-in on the extended reservation.

18.     Ms. Gillay was conducting healthcare billing training via Zoom and fielding patient calls alone in the room, and had not left the room since the prior day, July 6, 2022.

19.     Ms. Gillay offered her own credit card. The hotel refused. Ms. Gillay offered cash. The hotel refused. Ms. Gillay notified the hotel that Plaintiff was at work, would return after work, and would provide the card. Ms. Gillay did not have Plaintiff's card, and no action by the hotel directed toward her could produce it until Plaintiff returned. Instead of waiting, the hotel persisted with calls and room visits alleging that they needed the card Ms. Gillay did not have.

20.     At 15:10:11 — approximately ten minutes after the 3:00 PM check-in time for the extension — the hotel placed a non-emergency call to law enforcement. The CAD record documented: "SUBJ MADE RESERVATION UNDER BOYFRIENDS NAME WHO IS SUPPOSED TO COME TO LOC LATER." Plaintiff was documented as the anticipated resolution to the incidental hold card. No dispatch entry reported violence, threats, disturbances, damages, payment dispute, or criminal conduct.

3

## C. Defendant Faul's Conduct Before and During Briefing

21.    Defendant Faul received the briefing from Maclah without independent inquiry. Defendant Faul's body-worn camera establishes that he greeted hotel staff with familiarity before any briefing, accepted Maclah's account without verification, and committed to a trespass plan within seconds of being told the cardholder would provide the card.

  a.    Familiarity Sequence (15:16:14 — 15:16:24). At 15:16:14, before any briefing, Maclah — not yet visible on camera — stated: "Welcome back." At 15:16:15 Defendant Faul stated: "Hello." At 15:16:16 Maclah stated: "We missed you." At 15:16:17 the General Manager stated: "Full moon." Defendant Faul laughed. At 15:16:20 Defendant Faul stated: "I understand, you got to do what you got to do." At 15:16:22 the General Manager gestured toward Maclah and stated: "Miss Lizzie." At 15:16:23 Maclah appeared in frame, hands clasped, smiling. Defendant Faul stated: "Miss Lizzie." At 15:16:24 Maclah stated: "208." Defendant Faul responded: "208." No briefing had yet occurred, and no facts about the incident had yet been presented to Defendant Faul.

  b.    Briefing (15:16:25 — 15:17:31). Maclah continued: "208, they were here last night, they swiped their credit card, everything was fine, for incidentals we're talking, for damages." Defendant Faul responded: "Right, that you get back." At 15:16:34 Maclah stated the hotel no longer had access to the card because "they extended through a third party." At 15:16:39 through 15:17:03 Maclah stated: "I called her a few times today, when I told her we needed the card she just hung up on me, she kept ignoring me for hours, but we need the card... and uh we went up there, she started yelling, slammed the door, so we're trying not to engage any more and just want her gone at this point and trespassed because clearly she's not in her right mind." At 15:17:04 Defendant Faul asked: "Gotcha. Is she the only one up there? Is there others?" That was Defendant Faul's only question. At 15:17:07 Maclah responded: "That's what she claims, the reservation is under a male that she says is her husband or boyfriend that will provide the card but it's past 3 o'clock so."

  c.    Faul's Stated Trespass Plan (15:17:18 — 15:17:31). At 15:17:18 through 15:17:28 Defendant Faul stated: "Alright so what we'll do is I'll have you go with me and uh I'll need you to issue the trespass warning, and if she refuses to go, um then she goes to jail." This statement was made seventeen seconds after Defendant Faul was told the male reservation holder would provide the card. At 15:17:30 Maclah, smiling, stated: "Ok now you tell me how to do that." At 15:17:31 Defendant Faul stated: "Okay yeah yeah yeah." At 15:17:31 Clerk 2, off camera, stated: "Get out stay out." Clerk 2's statement was unprompted; Defendant Faul had already answered Maclah's question.

22.    By the end of the briefing, Defendant Faul had no allegation before him of any conduct enumerated as a ground for trespass or removal under Florida Statute § 509.141: no controlled-substance activity, no intoxication, disorderly, or lewd conduct, no breach of the peace, no unpaid rent or charges, no damage to property, and no failure to depart by checkout. Maclah did not allege that the reservation was unpaid; she stated that the guests had extended the reservation "through a third party," which is why the hotel no longer had the card on file — and Defendant Faul acknowledged on his body-worn camera that the incidental hold was refundable ("right, that you get back"). Defendant Faul was further on notice that Plaintiff, the reservation holder, had the card and would provide it on return, and that Ms. Gillay therefore could not have refused a card she did not possess — not on the first, second, third, fourth, or fifth call, nor during any visit by any number

4

of staff to the room, including the general manager. Plaintiff, the cardholder, was at work and expected to return, as both dispatch and Maclah had told Defendant Faul.

23.     Defendant Faul identified no law-enforcement rationale for his presence and made no inquiry into the situation beyond whether other persons were in the room. His only question during the briefing was "Is she the only one up there? Is there others?" He did not ask when the cardholder was expected to return, whether the hotel had attempted to contact the cardholder, or why the hotel could not wait for the documented resolution. Defendant Faul committed to a trespass and arrest plan without making any inquiry that would have confirmed the matter was non-criminal and self-resolving, and proceeded to enforcement on that basis.

24.     At 15:19:46, behind Ms. Gillay's back and after the trespass had been executed, Defendant Faul gave Maclah a thumbs-up as Maclah posed, smiling. In the same seconds, Ms. Gillay — in the bathroom, speaking to the participants on her calls — stated, "I've got to leave here, so can we pick this up later?" (15:19:45–47), terminating her Zoom and phone calls under the deputies' armed presence, and at 15:19:52 stated, "I don't know what's going on here, it's stressing me out though."

**D. What Defendant Faul Knew Before Plaintiff's Arrival**

25.     Between 15:20:16 and 15:22:49, Ms. Gillay stated facts to Defendant Faul that placed the non-criminal, self-resolving nature of the matter directly before him, and Defendant Faul disregarded each.

    a.      At 15:20:24, Ms. Gillay stated: "We're here from Michigan, he's working, he's a doctor working in a clinic. We simply needed a few hours for him to get home from work. I'm trying to set up billing and everything else. They're pounding on the door and ringing this and I can't work." Defendant Faul responded: "Unfortunately, I'm unaware of what's going on."

    b.      At 15:20:45, Ms. Gillay stated: "I'm trying to work, I have no idea people are going to be pounding on the door. For incidentals? What am I going to do, use a towel? It's already been paid." Defendant Faul responded: "I guess it's just their policy."

    c.      At 15:21:10, Ms. Gillay stated: "I don't have a car here. He's got the car. This is really messed up. I don't have a car to put my stuff in, he's got the car." Defendant Faul responded: "Right."

    d.      At 15:21:51, Ms. Gillay stated: "Can you wait til 3:30 when he gets back? I'm trying to do training." Defendant Faul gave no response.

    e.      At 15:22:40, Ms. Gillay stated: "I'm on a training call for 6 hours." Defendant Faul responded: "Oh jeez."

26.     Across the encounter, Defendant Faul repeatedly stated that he did not know what was occurring and was present only because hotel staff had asked him to be.

    a.      First Admission (15:20:39). Defendant Faul stated: "Unfortunately, I'm unaware of what's going on." Defendant Faul had received Maclah's briefing at 15:16:25–15:17:07. Ms. Gillay was at that moment stating to him what was going on. Defendant Faul asked her no questions about it and recorded nothing other than her name and date of birth.

    b.      "Policy" Justification (15:20:45). When Ms. Gillay stated that the room was already paid and questioned what the incidental hold was for, Defendant Faul responded: "I guess it's just their policy." No hotel employee had stated any such policy to Defendant Faul on

5

his body-worn camera. Defendant Faul did not ask to see a policy, did not attempt to verify one, and identified none.

c.      Second Admission (15:34:32). Defendant Faul stated to Plaintiff: "I'm not sure what's going on. I'm just here because they asked me to be here." At that point Defendant Faul had received Maclah's briefing, had access to the CAD dispatch record, had been briefed extensively by Ms. Gillay, and had committed to arresting Ms. Gillay if she did not leave. Defendant Faul identified no statute, no crime, and no independent law-enforcement objective at any point in the encounter. He identified no request by anyone to remove Plaintiff, and no complaint or allegation of any kind regarding Plaintiff — who was never contacted by the hotel, and who was not present at any time between leaving for work before 9:00 a.m. and his first appearance on Defendant Faul's body-worn camera at 15:33:11.

**E. Monitoring of Plaintiff's Phone Call**

27.     Defendant Faul knew the registered, paying guest — Plaintiff — was not present. Plaintiff was at his clinic providing patient care; Defendant Faul had been told by dispatch and by hotel staff that the cardholder was expected to return and would provide the card. In Plaintiff's absence, an armed deputy entered and remained inside Room 208 — a private room Plaintiff had paid for in full and that was occupied by Ms. Gillay as Plaintiff's guest. No crime, violence, or disturbance had been alleged or occurred, and Defendant Faul had no warrant and no consent from Plaintiff or Ms. Gillay to enter or remain. At no point did Defendant Faul contact Plaintiff — the reservation holder, the occupant of the room, and the owner of the property within it — to notify him that his room and belongings were being cleared, to confirm that Ms. Gillay was authorized to enter or remove the property, or to obtain his authorization for any of it, though Defendant Faul knew Plaintiff was reachable and was expected to return. Defendant Faul did not ask whether anyone had attempted to reach Plaintiff and did not attempt to reach him himself. Defendant Faul remained inside the room nonetheless, a room containing confidential patient information, and was present, listening, and recording when Plaintiff's call came through on speaker at 15:24:17.

28.     At 15:24:17, Plaintiff called Ms. Gillay, whose phone was on speaker. Both Defendant Faul and Defendant Morgan were present in Room 208 and heard the call. At 15:24:22 Ms. Gillay answered: "Hello?" Plaintiff asked: "Are they really asking you to leave?" Ms. Gillay responded: "The police are here, escorting me out of here." Plaintiff stated: "What? What the fuck?" Ms. Gillay responded: "I know, I'm like, can you wait 'til he gets off work. Nope." Plaintiff did not know Ms. Gillay's speaker was activated or that the deputies were listening, and did not consent to the interception.

a.      Defendant Faul did not mute his body-worn camera when he heard Ms. Gillay's phone ringing. He did not step outside the private room to ensure that his body-worn camera did not capture the contents of the phone call. He did not mute his body-worn camera until 15:24:38, twenty seconds after the call commenced, and recorded the above interaction.

b.      Per Plaintiff's T-Mobile records, Plaintiff remained on the call with Ms. Gillay for approximately one minute and then called back for an additional eight minutes while he was driving to the hotel.

c.      At 15:26:02, Defendant Faul exited the room to intercept Plaintiff. Fla. Stat. § 934.03 prohibits the interception of oral communications without the consent of all parties.

**F. Interception of Plaintiff**

29.     Plaintiff parked at a distance from the hotel porte cochère, where Defendant Faul was positioned behind multiple visual obstacles to a clear line of sight into the parking lot. Defendant Faul had no line of sight to Plaintiff or to Plaintiff's vehicle. (Ex. C.) At 15:32:53, Defendant Faul grabbed his door handle. At that moment, the speakerphone call was still connected, on speaker, in Room 208, where Defendant Morgan remained with Ms. Gillay; Plaintiff was in the parking lot; and Defendant Faul's body-worn camera was muted. At 15:32:58, Defendant Faul exited his vehicle. Plaintiff was not visible on Defendant Faul's body-worn camera at either moment. Plaintiff first became visible at 15:33:11 — eighteen seconds after Defendant Faul reached for the door, and thirteen seconds after he exited. Defendant Faul did not scan or search; he proceeded directly toward Plaintiff and intercepted him approximately 150 feet from the porte cochère, before Plaintiff had any visual contact with the police vehicles. The speakerphone call remained connected, on speaker, until the moment Plaintiff became visible at 15:33:11. (Ex. C.) Defendant Faul had heard it in Room 208, and Defendant Morgan remained in Room 208 where he had continuous access while Plaintiff drove to the hotel.

30.     At 15:33:44, after entering the hotel, Plaintiff slowed and turned toward the front desk to engage hotel staff. At 15:33:47, Defendant Faul rotated and squared up chest-to-chest against Plaintiff, physically blocking his access to the front desk, and gestured toward the elevators with an outstretched arm and hand; Plaintiff was redirected away from the desk. Plaintiff was not a suspect, had committed no crime, and was the documented anticipated resolution to the incidental hold card for which law enforcement had been summoned. No reasonable person — intercepted by an armed deputy, blocked chest-to-chest, and directed away from the front desk — would have felt free to approach the desk or to terminate the encounter with Defendant Faul. Defendant Faul's body-worn camera was muted throughout this seizure; he unmuted only at 15:33:58, after Plaintiff had been redirected and was approaching the elevators. Plaintiff's statements during the interception and seizure were not captured.

**G. The Report's Card-Refusal Claim Is a Double Falsehood**

31.     Police Report SO22-211133 states that Plaintiff "refused to give her a credit card despite numerous requests." Defendant Faul's own body-worn camera contradicts this assertion in both respects: no card was requested of Plaintiff, and Plaintiff produced his card twice.

    a.      No card was requested of Plaintiff. Defendant Faul's body-worn camera records no request to Plaintiff for a card at any point in the encounter. Neither deputy nor any hotel employee asked Plaintiff to provide a card. There were no "requests," let alone "numerous" ones.

    b.      Plaintiff produced his card twice. At 15:37:23, Plaintiff produced his wallet at the front desk; it remained continuously visible for seventy seconds, until 15:38:33. At 15:37:30, Plaintiff displayed his credit card; Maclah stared at it and did not reach for it, did not ask for it, and did not process the incidental hold for which she had summoned law enforcement less than thirty minutes earlier. At 15:46:50, Plaintiff again removed his wallet and, at 15:46:55, was pulling his credit card from it to hand to Clerk 2 — when, at Defendant Faul's solicitation, Clerk 2 instead delivered a trespass barring Plaintiff from the property. At 15:47:04, Plaintiff returned the card to his wallet, only after it became apparent no one would accept it.

7

c.      Despite all of this, Defendant Faul solicited a trespass against Plaintiff and then stated in Police Report SO22-211133 that Plaintiff "refused to give her a credit card despite numerous requests."

### H. The Michigan Driver's License Photograph

32.      Police Report SO22-211133 contains Plaintiff's Michigan driver's license photograph on page 4 — a clean digital database image without the security overlay features present on an issued physical license. (Ex. A, p. 4; Ex. F.) Defendant Faul never requested, viewed, or possessed Plaintiff's driver's license; his body-worn camera shows no license handled and no photograph taken on scene. (Ex. C.) The FDLE Transaction Archive Report documents every outbound FCIC/NCIC query run on Plaintiff on July 7, 2022. The two vehicle-registration queries (Defendant Morgan, 15:49:49, transaction 58976394; Defendant Faul, 15:53:06, transaction 58979161) returned a Florida DHSMV registration record only — vehicle identification number, registration, registrant name and address, and insurer — and no photograph. The only person query run on Plaintiff (Defendant Faul, 16:27:58, transaction 59001626) errored at field validation — "Field <SOC> allows digits only" — and returned no data (HIT: 0, TST: 0); it was never re-run. (Ex. D.) The Michigan Secretary of State's certified record-access disclosure documents no law-enforcement access to Plaintiff's Michigan driving record on July 7, 2022, and no access by any Florida entity during all of 2022; the only two recorded 2022 accesses were by LexisNexis on April 22, 2022, and the Michigan Department of Licensing and Regulatory Affairs on May 6, 2022. (Ex. E.) No query in any of these records returned the Michigan driver's license photograph that appears in the report.

### I. The Solicited Trespass and Its False Attribution

33.      Defendant Faul directed Clerk 2 — a non-management employee — to issue the trespass warning against Plaintiff. Police Report SO22-211133 attributes the trespass to Maclah and does not name Clerk 2.

a.      At 15:46:35, Defendant Faul instructed Clerk 2: "Hey sir, before he goes, I just need you to tell him that he's trespassed from the location, okay?"

b.      At 15:46:48, Defendant Faul called Plaintiff back: "Hey sir, this gentleman has something he wants to tell you." Clerk 2 then delivered the trespass.

c.      Police Report SO22-211133 states that Defendant Faul "observed Widad issue the trespass." Maclah did not issue the trespass. Clerk 2 issued it. Clerk 2 does not appear anywhere in the report. Defendant Faul solicited the trespass from Clerk 2 and then attributed it in the report to a person who did not issue it.

34.      No one requested that Plaintiff leave the property or provide a card at any point — not in the non-emergency call at 15:10:11, not during the encounter, and not before Defendant Faul solicited the trespass at 15:46:35. Florida Statute § 509.141 authorizes removal of a guest only after the operator requests the guest to depart and the guest refuses to leave; only a guest who remains after such a request is "illegally on the premises," and only then may a law-enforcement officer act. § 509.141(2)–(4). None of that occurred as to Plaintiff. Plaintiff was not named in the dispatch, was not present when law enforcement was summoned, was never asked by the hotel to leave, and never refused any request to depart — he had arrived offering his card. The CAD record documented Plaintiff as the anticipated resolution: "SUPPOSED TO COME TO LOC LATER." Maclah told Defendant Faul the same thing directly, on his body-worn camera, at 15:17:07: "the

8

reservation is under a male... that will provide the card." (Ex. C, 15:17:07.) There was no statutory predicate for any trespass against Plaintiff. The predicate did not exist until Defendant Faul created it, soliciting the trespass from Clerk 2 — a non-management employee — as Plaintiff was exiting.

## J. Database Queries Following Incident Closure

35.    Plaintiff departed at 15:47:40. Defendant Faul's body-worn camera recording ends at 15:47:43. No body-worn camera asset of any kind exists beyond that point — Defendant Faul's recording had ended, and Defendant Morgan produced no body-worn camera footage at all. The FRQ queries on Plaintiff's tag (15:49:49 and 15:53:06) were therefore run after all body-worn camera recording had ended; no body-worn camera captured either query or any purpose for it. The only record of the queries is the CAD dispatch log and the FDLE Transaction Archive Report, which documents the bare retrieval of Plaintiff's DHSMV registration record and reflects no permissible purpose. (Ex. C; Ex. D; PCSO certification P089583-082922.) The incident was coded non-criminal. No crime was committed, suspected, or under investigation.

36.    At 15:49:49, Defendant Morgan ran an FRQ query on Plaintiff's Florida tag 77BFBI. An FRQ query returns the Florida DHSMV registration record — the registrant's name, address, date of birth, and insurer — and nothing more; it does not return a driver's-license number, a driver's-license photograph, or any Michigan driver record. Plaintiff was not named in the dispatch, which recorded the subject's name as unknown and identified Plaintiff only as the boyfriend "supposed to come to loc later"; Plaintiff provided no identifying information to any deputy. Defendant Morgan cleared the incident thirty-three seconds later, at 15:50:21. At 15:53:06 — after the encounter was operationally complete and Plaintiffs had departed the property — Defendant Faul ran a second FRQ query on the same tag. The incident was cleared as non-criminal at 15:56:03.

37.    At 16:27:58 — thirty-one minutes and fifty-five seconds after Defendant Faul cleared the incident at 15:56:03, and twenty-seven minutes after Defendant Faul had originated the report at 16:00 — Defendant Faul ran a person query on Plaintiff. The FDLE Transaction Archive Report shows Defendant Faul entered "UERY DATA" in the Social Security Number field, a nine-character alphabetic string in a field that accepts only nine numeric digits. The system returned: "Field <SOC> allows digits only." The query errored and returned no data (HIT: 0, TST: 0). Defendant Faul did not re-run the query. The incident had been cleared as non-criminal; the report identifies no crime, no suspect, and no ongoing investigation. Defendant Faul's own documentation forecloses any permissible purpose under 18 U.S.C. § 2721(b) for a post-clearance database query.

## K. Suppression of the Call Audio

38.    On July 21, 2022, Plaintiff submitted a public records request to PCSO (P087491-072122) for the "Trespass police call, report and body cam footage" for Case SO22-211133. PCSO charged Plaintiff $38.05, stated there were "potential items responsive," and produced the report, CAD notes, and body-worn camera footage — but not the audio of the call that summoned the deputies, and without disclosing that the call audio was maintained by Pinellas County Regional 9-1-1, a separate custodian. On July 8, 2025, Plaintiff requested the call audio again (P154060-070825); PCSO responded the next day that there were "no responsive public records" and directed Plaintiff to "contact 911 Regional (727-464-3835)." Plaintiff submitted that request to Pinellas County Regional 9-1-1 on July 9, 2025 (R016242-070925). On July 16, 2025, Pinellas County Regional 9-1-1 responded that "the request was not made within the retention period Pinellas County adheres to" and that "the record(s) of the call(s) you requested no longer exists." The call to dispatch was

9

logged with a Method of Alarm of "10 DIGIT," and the audio was held by Pinellas County Regional 9-1-1 as custodian. Plaintiff's 2022 request for "the trespass police call" encompassed the audio of that call. PCSO held the report, CAD, and body-worn camera footage but not the call audio, and PCSO's 2025 redirect to Pinellas County Regional 9-1-1 establishes that PCSO knew in 2022 which agency held the audio. PCSO produced its other records, accepted Plaintiff's $38.05, and neither produced the call audio nor identified its custodian — at a time when the recording still existed.

**L. Timeliness**

39.    Plaintiff's DPPA claim is timely. The Driver's Privacy Protection Act has no limitations period of its own, and the four-year catch-all period of 28 U.S.C. § 1658(a) applies. A DPPA claim accrues when the alleged violation occurs. Foudy v. Miami-Dade Cnty., 823 F.3d 590, 593–94 (11th Cir. 2016). The database accesses at issue occurred on July 7, 2022 — Defendant Morgan's query at 15:49:49, Defendant Faul's query at 15:53:06, and Defendant Faul's person query at 16:27:58 — and this action is filed within four years of that date. The claim is therefore timely under the occurrence rule the Eleventh Circuit applies. Plaintiff's discovery in 2025, upon obtaining the FDLE Transaction Archive Report and the Michigan Secretary of State disclosure, of the facts establishing that Defendant Faul's person query errored and returned no data, that no Florida entity accessed Plaintiff's Michigan driving record during 2022, and that the Michigan photograph in the report is not shown by any documented authorized access, goes to the merits of the violation, not to accrual. Plaintiff's claim under Fla. Stat. § 934.10 is timely under the four-year limitations period applicable to claims accruing before March 24, 2023. See Fla. Stat. § 95.11(3)(o) (pre-amendment); Ch. 2023-15, § 4, Laws of Fla. (prospective application). The conduct occurred on July 7, 2022, and this action is filed within four years.

## QUALIFIED IMMUNITY DOES NOT APPLY OR IS DEFEATED

40.    For Count I, qualified immunity is defeated. The Driver's Privacy Protection Act prohibits knowingly obtaining personal information from a motor vehicle record for a purpose not permitted under 18 U.S.C. § 2721(b), and creates a private right of action for its violation. 18 U.S.C. § 2724. On the facts the Defendants knew, no permissible purpose existed for the queries: Plaintiff was not a suspect, was not named in the dispatch, and provided no identifying information; the queries were run after the incident was operationally complete, were duplicative of a record already obtained, and — as to the 16:27:58 person query — were run after the incident was cleared as non-criminal. No reasonable officer could have believed that a post-clearance, duplicative query on a non-suspect served any purpose permitted under § 2721(b). See Collier v. Dickinson, 477 F.3d 1306 (11th Cir. 2007). For Count IV, the Florida Security of Communications Act creates a private right of action for the interception of oral communications without all-party consent, and no statutory law-enforcement exception applies where, as here, the interception served no lawful investigative purpose. Fla. Stat. §§ 934.03, 934.10; Maracich v. Spears, 570 U.S. 48 (2013).

41.    For Counts II and III, qualified immunity is defeated. The right to be free from seizure absent reasonable suspicion has been clearly established for decades. Terry v. Ohio, 392 U.S. 1 (1968). No reasonable officer could believe that seizing or threatening to arrest a lawful, paying hotel guest absent any criminal conduct was constitutional. The right to be free from fabricated evidence was clearly established in the Eleventh Circuit. Williams v. Aguirre, 965 F.3d 1147, 1158–59 (11th Cir. 2020) (fabrication of evidence to support a seizure violates the Fourth Amendment); Sylvester v. Fulton County, 94 F.4th 1324, 1326 (11th Cir. 2024) ("When a police

officer intentionally lies or recklessly misleads a judge to obtain an arrest warrant, the resulting arrest violates the Fourth Amendment."); Kingsland v. City of Miami, 382 F.3d 1220, 1229–30, 1232 (11th Cir. 2004) (an officer may not "consciously and deliberately" ignore reasonably discoverable, material information, and "falsifying facts to establish probable cause is patently unconstitutional"), abrogated on other grounds by Williams, 965 F.3d at 1159; Riley v. City of Montgomery, 104 F.3d 1247, 1253 (11th Cir. 1997) ("It was well established in 1989 that fabricating incriminating evidence violated constitutional rights"). This principle is consistent with other circuits recognizing that the deliberate inclusion of false statements in official reports violates due process. Devereaux v. Abbey, 263 F.3d 1070 (9th Cir. 2001); Gregory v. City of Louisville, 444 F.3d 725 (6th Cir. 2006) (persuasive authority). No reasonable officer could believe that inserting false statements into a police report — contradicted by the officer's own body-worn camera footage and government database records — was lawful.

42.    Each materially false statement in Police Report SO22-211133 is contradicted by the government's own records or by Defendant Faul's own body-worn camera. No entry below relies on Plaintiff's recollection or any contested testimony. No reasonable officer could believe that committing these statements to an official report was lawful.

   a.    The report states that "an NCIC/FCIC check was negative for wants or warrants." No successful NCIC/FCIC wants-or-warrants check on Plaintiff was ever run. The report was originated at 16:00. The only person query on Plaintiff was run at 16:27:58 — twenty-seven minutes later — entered "UERY DATA" in the SOC field, errored with "Field <SOC> allows digits only," and returned no data (HIT: 0, TST: 0). The vehicle queries at 15:49:49 and 15:53:06 were stolen-vehicle checks on the license plate, not person-level wants-or-warrants checks, and a plate query cannot return a person "negative for wants or warrants." The "negative" result was therefore recorded before any person query was attempted, and the only person query attempted errored and returned nothing. (Ex. D.)

   b.    The report states that "one (1) photo was taken of Randy and uploaded." Defendant Faul's body-worn camera documents the entire encounter; no photograph of Plaintiff was taken and no identification was requested. (Ex. C.)

   c.    The report embeds a Michigan driver's license photograph of Plaintiff on page 4 — a clean database image without security overlays. The Michigan Secretary of State's certified disclosure shows no law-enforcement access to Plaintiff's Michigan driving record on July 7, 2022, and the only person query errored and returned no data. The photograph's source is unexplained by any documented authorized access. (Exs. E, D, F.)

   d.    The report states that Plaintiff "refused to give her a credit card despite numerous requests." No card was requested of Plaintiff. Plaintiff's wallet was visible at the front desk from 15:37:23 to 15:38:33; his credit card was displayed at 15:37:30; and Maclah looked at it without taking or processing it. Maclah stated at 15:37:50, "We weren't asking her to leave, we were asking for the card." Maclah had also told Defendant Faul at 15:17:07 that the reservation was "under a male… that will provide the card, but it's past 3 o'clock" — that the cardholder would provide the card upon arrival. A card that the arriving cardholder would provide cannot also be a card that was "refused," and Ms. Gillay could not refuse a card she did not hold. The card at issue was a refundable incidental hold, not a payment: Defendant Faul himself stated on his body-worn camera at 15:16:30, "right, yeah, that you get back, you know everything." The report's characterization of a "refused" credit card

11

implies a payment that was owed and withheld, a matter Defendant Faul's own recorded statements show he knew did not exist. (Ex. C.)

e.        The report states that Defendant Faul "observed Widad issue the trespass." At 15:46:35 Defendant Faul instructed Clerk 2 — a non-management employee — to issue the trespass, and Clerk 2 delivered it. Maclah did not issue it. Clerk 2 is not named in the report. (Ex. C.)

f.        The report omits that Plaintiff was the documented anticipated resolution. The CAD recorded: "SUBJ MADE RESERVATION UNDER BOYFRIENDS NAME WHO IS SUPPOSED TO COME TO LOC LATER," and no dispatch entry reported violence, crime, or disturbance. (Ex. B.)

g.        The report states that Defendant Faul "was able to identify the male as Randy P. Ayres." Defendant Faul's body-worn camera shows that no identification was ever requested of Plaintiff and that Plaintiff provided none during his presence from 15:33:11 to 15:47:43. Plaintiff's name and date of birth were contained in the DHSMV registration record returned by the FRQ tag query — including the 15:53:06 query run after the incident was operationally complete — not obtained through any identification process. A registration record identifies the registrant of a vehicle; it does not confirm that the person present is that registrant, and Defendant Faul never confirmed Plaintiff's identity by any means. The only attempted person query on the registered owner of the vehicle (16:27:58) errored and returned no data. (Exs. C, D.)

h.        The report describes the trespass of "subjects" in the plural. The CAD recorded a request to remove a single "guest" and identified Plaintiff only as the absent boyfriend "supposed to come to loc later." Plaintiff was not present when the call was placed at 15:10:11, was not present when the trespass warning was issued to Ms. Gillay, and did not appear until 15:33:11. (Exs. A, B, C.)

i.        The report states: "Widad informed me the tenants in Room 208 refused to give her a credit card despite numerous requests. Widad wished to trespass the tenants from the location." Both statements are contradicted by Defendant Faul's body-worn camera. First, Maclah did not tell Defendant Faul that anyone refused to give a credit card. At 15:16:34 she stated that the reservation was made "through a third party, which means we don't have access to their card anymore," and that when she called for the card Ms. Gillay "hung up on me and kept ignoring me for hours" — describing a loss of card access through the third-party booking, not a refusal, and describing Ms. Gillay alone, not Plaintiff. Second, Maclah never stated that she wished to trespass Plaintiff from the location. Maclah did not know Ms. Gillay's name and referred to Plaintiff only as the husband or boyfriend who would provide the card; she told dispatch the cardholder was "supposed to come to loc later." At no point did Maclah state any wish to have Plaintiff removed or trespassed. The word "tenants," in the plural, sweeps Plaintiff into a removal request the hotel never made as to him. The CAD likewise records only that the card was "for file" and that the male reservation-holder was "supposed to come to loc later." No record reflects that Plaintiff, who was not present, refused anything or was the subject of any request to remove or trespass him. (Exs. B, C.)

## CLAIMS FOR RELIEF

12

**COUNT I: DRIVER'S PRIVACY PROTECTION ACT — 18 U.S.C. § 2724 — Against Defendants Faul, Morgan, and Wiatrak**

43.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

44.     The Driver's Privacy Protection Act prohibits knowingly obtaining or using personal information from a motor vehicle record for a purpose not permitted under the statute. 18 U.S.C. §§ 2721, 2722. A license plate displayed on a vehicle is visible to the public; the Florida Department of Highway Safety and Motor Vehicles (DHSMV) registration record retrieved by querying that plate — containing the registrant's name, address, date of birth, and insurer — is a protected motor vehicle record, and obtaining it requires a permissible purpose under § 2721(b).

45.     On July 7, 2022, Defendants obtained Plaintiff's personal information from motor vehicle records as follows:

a.     At 15:49:49, Defendant Morgan ran an FRQ query on Plaintiff's Florida tag 77BFBI (transaction 58976394), retrieving Plaintiff's Florida DHSMV registration record — registrant name, address, date of birth, and insurer. Plaintiff was not the subject of the incident, was not named in the dispatch, and provided no identifying information; Defendant Morgan cleared the incident thirty-three seconds later, at 15:50:21. The query was not a random or routine check of a vehicle encountered in public — it targeted Plaintiff's specific tag to obtain Plaintiff's identifying information. There was no permissible purpose for it under 18 U.S.C. § 2721(b).

b.     At 15:53:06, Defendant Faul ran a second FRQ query on the same tag 77BFBI (transaction 58979161), retrieving the identical Florida DHSMV registration record — after the encounter was operationally complete and Plaintiffs had departed the property, and after Defendant Morgan had already obtained that record on the shared incident. The duplicate query served no investigative purpose and had no permissible purpose under 18 U.S.C. § 2721(b).

c.     Plaintiff's Michigan driver's license photograph appears in Police Report SO22-211133, despite zero documented law-enforcement access to Plaintiff's Michigan driving record on July 7, 2022.

46.     These FRQ queries had no permissible purpose under 18 U.S.C. § 2721(b). No crime was committed, suspected, or under investigation. Plaintiff was not the subject of the incident, was never named in the dispatch, and provided no identifying information; the FRQ queries were the sole means by which Defendants obtained Plaintiff's identifying information. That Plaintiff's tag was visible in public does not supply a permissible purpose: the Act regulates the obtaining of the protected DHSMV record behind the plate, not the viewing of the plate, and Defendants retrieved that record by targeting Plaintiff's specific tag. To the extent Defendants contend the purpose was to identify Plaintiff for Police Report SO22-211133, that purpose is not permissible: creating a police report that fabricates results, contains a photograph traceable to no logged query, and describes events contradicted by body-worn camera footage is not a legitimate government function under § 2721(b). Obtaining protected motor-vehicle data in service of fabricating a record about the data subject is not access "in carrying out [an agency's] functions." Each FRQ query and each access to Plaintiff's DHSMV record without a permissible purpose constitutes a separate violation. Defendant Wiatrak approved Police Report SO22-211133 on July 11, 2022, which

13

records and disseminates information represented as derived from an "NCIC/FCIC check" on Plaintiff, at a time when the report identified no crime, suspect, or ongoing investigation.

47.     Defendants' conduct violated 18 U.S.C. § 2724, entitling Plaintiff to liquidated damages, punitive damages, and attorneys' fees. A plaintiff need not prove actual damages to recover the statute's liquidated damages. Kehoe v. Fidelity Federal Bank & Trust, 421 F.3d 1209 (11th Cir. 2005).

**COUNT II: FOURTH AMENDMENT — UNREASONABLE SEIZURE — 42 U.S.C. § 1983 — Against Defendant Faul**

48.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

49.     Plaintiff was the documented resolution, not the problem. The CAD record establishes that Plaintiff was "supposed to come to loc later" to provide the card. No one called law enforcement about Plaintiff. No one asked Plaintiff to leave.

50.     First Seizure. Defendant Faul intercepted Plaintiff in the parking lot after monitoring Plaintiff's phone call without consent. When Plaintiff stopped and turned toward the front desk, Defendant Faul rotated to face Plaintiff chest-to-chest, physically blocked Plaintiff's access to the front desk, and directed Plaintiff toward the elevators. No crime was alleged or suspected. A reasonable person in Plaintiff's position — confronted by a uniformed deputy who exited his vehicle before Plaintiff was visible, proceeded directly toward Plaintiff, positioned himself chest-to-chest, and physically redirected Plaintiff away from the front desk — would not have felt free to disregard the deputy's direction and proceed to the desk.

51.     Second Seizure. Defendant Faul called Plaintiff back at the exit threshold to receive a trespass that Defendant Faul had solicited from Clerk 2, a non-management employee. Plaintiff reached for his wallet expecting resolution and received a trespass instead. No one had asked Plaintiff to leave at any point. A reasonable person in Plaintiff's position — called back by a uniformed deputy at the exit threshold after being redirected from the front desk at that deputy's direction — would not have felt free to disregard the command and leave.

52.     Both seizures occurred without reasonable suspicion or probable cause, in violation of the Fourth Amendment.

53.     The seizures caused Plaintiff cognizable injury. Plaintiff — a licensed physician who had left a clinic mid-shift and arrived in scrubs, a stethoscope, and medical gloves to resolve the matter the hotel and Defendant Faul had been told he would resolve — was physically blocked, redirected, and called back under color of authority before a lobby of onlookers. Plaintiff stated contemporaneously, on Defendant Faul's body-worn camera, that the experience was humiliating. (Ex. C, 15:39:04, 15:45:53.) The humiliation, indignity, and emotional distress of the public seizure are documented on the recording itself and are compensable, in addition to nominal and punitive damages for the constitutional violation.

**COUNT III: FOURTEENTH AMENDMENT — FABRICATION OF EVIDENCE — 42 U.S.C. § 1983 — Against Defendants Faul and Wiatrak**

54.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

14

55.    Police Report SO22-211133 contains materially false statements contradicted by government records and body-worn camera footage, and reflects the deliberate failure to gather or document exculpatory evidence apparent at every stage. Under Kingsland v. City of Miami, 382 F.3d 1220, 1229–30 (11th Cir. 2004), abrogated on other grounds by Williams v. Aguirre, 965 F.3d 1147, 1159 (11th Cir. 2020), officers violate clearly established due-process rights when they fabricate evidence, make materially false statements, or "consciously and deliberately" ignore reasonably discoverable, material information. Defendant Faul did both: he made false statements and ignored the exculpatory evidence before him.

a.    False claim that Plaintiff "refused to give her a credit card despite numerous requests." No card was requested of Plaintiff, and body-worn camera shows Plaintiff's wallet continuously visible 15:37:23–15:38:33 (seventy seconds), the credit card displayed at 15:37:30, and Maclah staring at the card without reaching for it.

b.    False claim that "One (1) photo was taken of Randy and uploaded." Body-worn camera shows no photograph was taken and no identification was requested.

c.    False claim that an "NCIC/FCIC check was negative for wants or warrants." The report was originated at 16:00; the only person query on Plaintiff was run at 16:27:58 — twenty-seven minutes later — and errored, returning no data (HIT: 0, TST: 0). The "negative" result was committed to the report before any query was attempted, and the only query attempted returned nothing.

d.    False claim that Defendant Faul "observed Widad issue the trespass." Body-worn camera shows Defendant Faul solicited the trespass from Clerk 2, who is not named anywhere in the report.

e.    Inclusion of Plaintiff's Michigan driver's license photograph, the presence of which is unexplained by any documented authorized access; the Michigan Secretary of State disclosure confirms zero law-enforcement access on July 7, 2022.

56.    Defendant Wiatrak approved the report on July 11, 2022, despite these contradictions being apparent from the CAD records, the FDLE Transaction Archive Report, and body-worn camera footage available to him. Defendant Wiatrak ratified a report containing a photograph with no documented query source, a fabricated NCIC/FCIC result, and a false attribution of the trespass. Police Report SO22-211133 remains an official law-enforcement record.

57.    The existence of that false official record is itself an injury to Plaintiff. Police Report SO22-211133 identifies Plaintiff — a physician licensed in Michigan and Florida — as the subject of a trespass that Defendant Faul manufactured, and it remains in the records of the Pinellas County Sheriff's Office. A false law-enforcement record of this kind carries inherent reputational risk for a licensed physician; the full extent of its dissemination and downstream effect is presently undetermined and is a subject for discovery. Plaintiff seeks compensatory and punitive damages and correction or expungement of the record.

**COUNT IV: FLORIDA SECURITY OF COMMUNICATIONS ACT — Fla. Stat. § 934.10 — Against Defendants Faul and Morgan**

58.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

59.    Florida's Security of Communications Act prohibits the intentional interception of oral communications without the consent of all parties. Fla. Stat. § 934.03. The intercepted

15

communication occurred under circumstances giving rise to a reasonable expectation of privacy: a private phone call received in a closed hotel room, not intended for dissemination to any third party. No statutory law-enforcement exception applies — the interception was not conducted pursuant to any valid investigation, warrant, or authorized surveillance, and Plaintiff did not consent. Fla. Stat. § 934.10 provides a civil cause of action to any person whose oral communication is intercepted in violation of the Act.

60.     At 15:24:17 on July 7, 2022, Plaintiff called Ms. Gillay, whose phone was on speaker in the closed room. Both Defendant Faul and Defendant Morgan were present in the room. Defendant Faul's body-worn camera captured part of the call while both Defendants were present. Plaintiff is a party to the communication and did not consent to its interception. Florida is an all-party-consent state; the absence of Plaintiff's consent is sufficient to establish a violation.

61.     The speakerphone call between Plaintiff and Ms. Gillay remained connected from 15:25 until 15:33 — ending at the moment Plaintiff appeared in the parking lot (15:33:11) — as documented by Plaintiff's T-Mobile records. Defendant Faul exited his vehicle before Plaintiff became visible on camera, without visual access to the parking lot and without any physical description of Plaintiff, and proceeded directly to him.

62.     Defendants' conduct violated Fla. Stat. § 934.03, entitling Plaintiff to statutory damages, punitive damages, reasonable attorneys' fees, and litigation costs under Fla. Stat. § 934.10.

## COUNT V: MONELL MUNICIPAL LIABILITY — 42 U.S.C. § 1983 — Against Defendant Sheriff Robert Gualtieri in His Official Capacity

63.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein. A municipality is liable under 42 U.S.C. § 1983 when a constitutional violation results from an official policy, custom, or practice; from deliberate indifference through failure to train or supervise; or from ratification of the violation by a final policymaker or the official to whom policymaking authority has been delegated. Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978); City of Canton v. Harris, 489 U.S. 378 (1989); City of St. Louis v. Praprotnik, 485 U.S. 112 (1988). Defendant Sheriff Robert Gualtieri, in his official capacity, is the final policymaker for the Pinellas County Sheriff's Office and is responsible for its policies, customs, training, supervision, and official records.

64.     Ratification. The constitutional violations alleged in Counts I through IV were ratified through the supervisory approval of Police Report SO22-211133. Defendant Wiatrak, the approving supervisor and Last Update Operator in the ACISS system, approved the report on July 11, 2022 at 08:39, despite the report's falsity being apparent from the agency's own records. Each materially false statement set forth above was contradicted by the CAD records, the FDLE Transaction Archive Report, the Michigan Secretary of State disclosure, or Defendant Faul's body-worn camera — all within the agency's systems and available to Defendant Wiatrak: the "NCIC/FCIC negative" result committed to the report before the only person query was run, which errored and returned no data; the claim that "one (1) photo was taken," when the body-worn camera shows none was taken; the embedded Michigan driver's license photograph with no documented query source; the claim that Plaintiff "refused to give her a credit card," when the body-worn camera shows the card displayed and unrequested; the claim that Defendant Faul "observed Widad issue the trespass," when the body-worn camera shows the trespass was solicited from a non-management clerk not named in the report; the omission that Plaintiff was the documented anticipated resolution; the claim that Defendant Faul "identified the male," when no identification

was requested and no person query on Plaintiff returned data; and the description of the trespass of "subjects" in the plural, when the CAD recorded a single "guest" and Plaintiff was not present at the call or the trespass. A supervisor's approval of a report false in each of these respects — every falsehood verifiable from the agency's own systems — is ratification of the underlying conduct. Defendant Wiatrak either approved Police Report SO22-211133 without reviewing the agency records that contradicted it, or reviewed those records and approved the report despite them. The first is a failure to perform the supervisory review the approval represents; the second is approval of falsity known to him. Either establishes ratification and deliberate indifference, because the contradictions were apparent on the face of the agency's own systems at the moment of approval.

65.    Failure to Gather and Preserve Exculpatory Evidence at Every Stage. The violations reflect a systemic failure to gather, document, or preserve evidence that contradicted the narrative reflected in Police Report SO22-211133, at every stage of the encounter: the card produced twice and ignored; Maclah's recorded admission that removal was never requested; the CAD record documenting Plaintiff as the anticipated resolution; the entry into the reservation holder's room without notice to him and without identifying him; the errored query documented as a "negative" result; and the call audio that PCSO failed to identify or preserve. Defendant Wiatrak ratified the report despite these contradictions being apparent from the agency's own records.

66.    Failure to Train and Supervise — Body-Worn Camera. Defendant Faul muted his body-worn camera at each discrete operational act of the encounter, and Defendant Morgan — alone with Ms. Gillay in a closed room for an extended period — produced no body-worn camera footage at all despite a visibly worn camera. PCSO certified in response to public records request P089583-082922 that no Defendant Morgan footage exists. The absence of any footage from Defendant Morgan and the muting pattern reflect a failure to train and supervise on body-worn camera activation and the preservation of evidence. (Ex. C.)

67.    Failure to Train and Supervise — DPPA. PCSO's failure to train deputies on permissible purposes under the Driver's Privacy Protection Act, and on the prohibition against documenting results from queries that errored and returned no data, directly caused the impermissible access of Plaintiff's motor-vehicle records and the false "NCIC/FCIC negative" statement in the report. At 15:49:49 Defendant Morgan queried Plaintiff's plate as Plaintiff departed; at 15:53:06 Defendant Faul ran a second query on the same vehicle, after the encounter was operationally complete. Plaintiff was a non-suspect who was never named in the dispatch and provided no identifying information; no permissible purpose existed for either query. At 16:27:58, after the incident was cleared as non-criminal, Defendant Faul ran a further person query on Plaintiff that errored and returned no data, the "negative" result of which had already been recorded in the report. (Exs. C, D.)

68.    Failure to Train Records Staff — Custodian Disclosure. PCSO's failure to train records staff on the affirmative duty to disclose related custodians directly caused the destruction of the call audio during the four-year limitations period. In 2022, Plaintiff requested the "trespass police call," paid $38.05, and received the report, CAD, and body-worn camera footage — but not the call audio, and without any disclosure that Pinellas County Regional 9-1-1 maintained it. In 2025, on a materially identical request, PCSO immediately directed Plaintiff to that custodian — establishing PCSO's institutional knowledge of the custodian in 2022. By the time of the 2025 disclosure, the recording had been destroyed under retention. The call audio would have captured Maclah's exact statements to the dispatcher — the predicate for Defendant Faul's arrival.

17

69.     Photograph Provenance. Government records establish that the embedded photograph in Police Report SO22-211133 has no documented query source on any date. The report was originated July 7, 2022 at 16:00 and last updated by Defendant Wiatrak on July 11, 2022 at 08:39. The only person query by any PCSO officer on July 7, 2022 errored at 16:27:58 — after the report was originated — and returned no data. The Michigan Secretary of State disclosure shows no Florida access during 2022. The complete ACISS audit trail for SO22-211133 — including all access events, save events, field-level edits, user credentials, and timestamps, and the upload timestamp, uploading user credentials, original filename, and source metadata for the embedded photograph — has not been produced and is demanded in discovery. The photograph's upload timestamp relative to the errored query is directly probative of its source. (Exs. A, C, D, E, F.)

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.     Enter judgment for Plaintiff and against Defendants Faul, Morgan, and Wiatrak in their individual capacities on Count I; against Defendant Faul in his individual capacity on Count II; against Defendants Faul and Wiatrak in their individual capacities on Count III; against Defendants Faul and Morgan in their individual capacities on Count IV; and against Defendant Sheriff Robert Gualtieri in his official capacity on Count V;

B.     Award compensatory damages against Defendants Faul, Morgan, and Wiatrak in their individual capacities on Counts I through IV, in an amount to be determined at trial;

C.     Award compensatory damages against Defendant Sheriff Robert Gualtieri in his official capacity on Count V, in an amount to be determined at trial;

D.     Award liquidated damages of $2,500 per DPPA violation under 18 U.S.C. § 2724(b)(1);

E.     Award punitive damages against Defendants Faul, Morgan, and Wiatrak in their individual capacities;

F.     Award reasonable attorneys' fees and costs under 42 U.S.C. § 1988, 18 U.S.C. § 2724(b)(3), and Fla. Stat. § 934.10;

G.     Order removal of the trespass warning and restoration of Plaintiff's right to access the premises;

H.     Order expungement of Police Report SO22-211133 and all associated records;

I.     Order destruction of all copies of Plaintiff's Michigan driver's license photograph in PCSO's possession, custody, or control;

J.     Enter declaratory judgment that Defendants' conduct violated Plaintiff's rights under the Fourth and Fourteenth Amendments, the Driver's Privacy Protection Act, and the Florida Security of Communications Act;

K.     Enter an adverse-inference instruction based on the destruction of the call audio during the retention period following PCSO's 2022 production response, permitting the jury to infer that the destroyed recording contained evidence favorable to Plaintiff;

L.     Award sanctions for the destruction of the call audio;

M.     Grant such other and further relief as the Court deems just and proper.

18

## JURY DEMAND

70.    Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Randy Ayres, Pro Se
11008 Vida Circle Drive #101
Lakewood Ranch, FL 34211
(941) 529-7923
FLCASES@yahoo.com

Dated: ___7/6/2026___

19

# EXHIBITS

**Exhibit A:** Police Report SO22-211133

**Exhibit B:** CAD Activity Log / Dispatch Notes (July 7, 2022)

**Exhibit C:** Body-Worn Camera — Selected Stills (Deputy Michael Faul)

**Exhibit D:** FDLE Transaction Archive Report — Database Queries for Plaintiff, July 7, 2022

**Exhibit E:** Michigan Secretary of State Record-Access Disclosure

**Exhibit F:** Comparison — Plaintiff's Michigan Driver License and the Photograph Embedded in Police Report SO22-211133

*The exhibits filed herewith include, but are not limited to, those identified above. Additional government records and public-records responses referenced in this Complaint are in Plaintiff's possession and will be produced in discovery or upon request of the Court.*